UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ARIEL CERVANTES ANGUIANO,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES IMMIGRATION AND CUSTOMS ENFORCEMENT,<br><br>Defendant. | Case No.18-cv-01782-JSC<br><br>**ORDER RE: CROSS-MOTIONS FOR SUMMARY JUDGMENT**<br><br>Re: Dkt. Nos. 23, 25 |

Plaintiff Ariel Cervantes Anguiano filed this action under the Freedom of Information Act, 5 U.S.C. § 552 ("FOIA"), seeking 12 categories of documents from the United States Immigration and Customs Enforcement agency ("ICE") for purposes of a motion to suppress he plans to bring in his removability proceedings pending in immigration court. (Dkt. Nos. 23 & 25.) The parties' cross-motions for summary judgment are now pending before the Court.[1]  Having carefully considered the parties' submissions and having had the benefit of oral argument on November 9, 2018, the Court concludes that (1) ICE has failed to prove as a matter of law that its search was adequate in all respects; (2) the Court cannot make a determination regarding ICE's invocation of Exemptions 5 and 7(E) without a review of certain documents *in camera*; and (3) ICE properly invoked Exemption 6 and 7(C) to protect private information regarding third parties and ICE employees.

## BACKGROUND

Plaintiff is a resident of San Francisco, California who was arrested by ICE on March 2, 2015 and charged with removability from the United States.  (Complaint at ¶ 5.)  Plaintiff plans to file a motion to suppress evidence in his removal proceedings based on violations of his Fourth

---

[1] Both parties have consented to the jurisdiction of a magistrate judge pursuant to 28 U.S.C. § 636(c).  (Dkt. Nos. 8 & 11.)

and Fifth Amendment rights by ICE officers at the time of his arrest.[2] (*Id.* at ¶ 6.)  In connection with the motion to suppress, Plaintiff filed a FOIA request on June 5, 2017 seeking the following 12 categories of documents:

1. Any warrant of deportation/removal, warrant for arrest of alien, and any search warrant, relied upon in the course of Mr. Cervantes's apprehension;

2. Any and all records or information relied upon in the issuance of any warrants for Mr. Cervantes; and any other records or information related to the issuance of such warrants;

3. Any and all records or information relevant to Mr. Cervantes's alleged alienage, admissibility, or deportability;

4. Any and all records containing, describing, referring to, or relating to Mr. Cervantes's apprehension and custody by ICE, including, but not limited to:

   a. any statements or evidence obtained from Mr. Cervantes during his apprehension or custody;

   b. Field Officer Worksheets;

   c. unredacted forms I-200 and I-213, and draft versions of these forms, including but not limited to the "scratch" I-213;

   d. all documents provided to, or signed by, Mr. Cervantes during his apprehension and custody by ICE;

5. Any and all records or information related to planning Mr. Cervantes's apprehension, including but not limited to all records or information relating to the polices and protocols specific to ICE enforcement actions conducted as part of Operation Crosscheck VI;

6. Any and all records or information identifying the agencies and individuals who participated in Mr. Cervantes's apprehension, including individuals' names and job titles;

7. Any and all records describing, referring to, or containing information revealing the weapons and uniforms issued to the individuals who participated in Mr. Cervantes's apprehension on March 2, 2015;

8. Any and all documents regarding the work performance of each individual involved in the apprehension and detention of Mr. Cervantes on March 2, 2015, including disciplinary records or investigations;

9. A complete copy of any Department of Homeland Security or Department of Justice manual for immigration officers regarding the law of arrest, search, and seizure in effect on March 2, 2015;

10. Any and all records related to the formal or informal training which was received or should have been received by the ICE agents who apprehended Mr. Cervantes, regarding the rights of persons stopped, questioned, or apprehended by ICE under

United States District Court
Northern District of California

---

[2] The opening brief is due February 8, 2019.

the immigration regulations, federal, state, and local laws, and under the Constitution of the United States;

11. Any and all records regarding ICE, Department of Homeland Security, or Department of Justice policies in effect on March 2, 2015 regarding the rights of persons stopped, questioned, searched, arrested, or detained by ICE officers;

12. Any and all records or information regarding ICE communications with the San Francisco Police Department related to Mr. Cervantes's apprehension and/or related to ICE officers identifying themselves as police or police officers.

(Dkt. No. 23-2 at 28.[3])

ICE responded to Plaintiff's FOIA request on June 12, 2017, stating that it was referring his request to the United States Citizenship and Immigration Services ("USCIS") because the request sought documents contained in Plaintiff's A-file. (Complaint at ¶ 17; Dkt. No. 23-2 at 32.) Plaintiff responded by objecting to the characterization of his request as seeking documents from his A-file, but he did not receive a substantive response to his objection. (Complaint at ¶¶ 17-23.) A month later, USCIS informed ICE that it had identified 87 pages as responsive. (Dkt. No. 23-1 at ¶ 12.) The ICE FOIA office processed these records and marked 42 of them as duplicates and released 45 pages of documents to Plaintiff, which included 7 pages in full, 34 partially redacted pages, and 4 fully redacted pages. (*Id*. at ¶ 13.) Plaintiff responded with an email seeking the full 87 pages identified by USCIS and for ICE to search its own records. In response, ICE provided a "final response" including 45 pages of the 87 pages USCIS referred to ICE. (Complaint at ¶¶ 25-27.)

On November 22, 2017, Plaintiff submitted an administrative appeal. (*Id*. at ¶ 28; Dkt. No. 23-2 at 42.) A month later, ICE advised Plaintiff that it had concluded that "new search(s) or, modifications to the existing search(s), could be made" and remanded Plaintiff's appeal to the ICE FOIA Office. (Complaint at ¶ 30; Dkt. No. 23-2 at 48.)

Having received no further response from ICE by March 22, 2018, Plaintiff filed the underlying action seeking declaratory and injunctive relief under FOIA, 5 U.S.C. § 552(a). (Dkt. No. 1.) The parties' cross-motions for summary judgment are now fully briefed.

---

[3] Record citations are to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of the documents.

**DISCUSSION**

There are two primary issues with respect to Plaintiff's FOIA request. First, the adequacy of ICE's search for documents responsive to the 12 categories set forth in Plaintiff's FOIA request. Second, the propriety of ICE's claimed exemptions. With respect to the latter issue, Plaintiffs ask the Court to conduct an *in camera* review of ICE's withheld and redacted documents to determine whether the claimed exemptions are reasonable.

**A.      Adequacy of ICE's Search**

"FOIA requires an agency responding to a request to demonstrate that it has conducted a search reasonably calculated to uncover all relevant documents." *Hamdan v. U.S. Dep't of Justice*, 797 F.3d 759, 770 (9th Cir. 2015) (internal citation and quotation marks omitted). To demonstrate "the adequacy of the search, the agency may rely upon reasonably detailed, nonconclusory affidavits submitted in good faith." *Zemansky v. U.S. E.P.A.*, 767 F.2d 569, 571 (9th Cir. 1985). In reviewing the adequacy of a search, the issue "is not whether there might exist any other documents possibly responsive to the request, but rather, whether the search for those documents was adequate." *Lahr v. Nat'l Transp. Safety Bd.*, 569 F.3d 964, 987 (9th Cir. 2009). "The adequacy of the agency's search is judged by a standard of reasonableness, construing the facts in the light most favorable to the requestor." *Citizens Comm'n on Human Rights v. Food & Drug Admin.*, 45 F.3d 1325, 1328 (9th Cir. 1995). "[T]he failure to produce or identify a few isolated documents cannot by itself prove the searches inadequate." *Hamdan*, 797 F.3d at 771. Summary judgment is inappropriate "if a review of the record raises substantial doubt, particularly in view of well-defined requests and positive indications of overlooked materials...." *Hamdan*, 797 F.3d at 771 (internal citation and quotation marks omitted); *see also Animal Legal Def. Fund v. U.S. Food & Drug Admin.*, 836 F.3d 987, 989–90 (9th Cir. 2016) ("there is no principled distinction to be drawn between our usual summary judgment standard and the standard to be applied in FOIA cases…summary judgment may be granted only when there are no disputed issues of material fact, and thus no factfinding by the district court.").

In support of its motion for summary judgment, ICE submitted the declaration of Catrina Pavlik-Keenan, the Director of the Freedom of Information Act Office at ICE (the "ICE FOIA

Office"), which is responsible for processing and responding to all FOIA request received by ICE. (Dkt. No. 23-1 at ¶¶ 1-2.)  The Pavlik-Keenan declaration includes a detailed description of ICE's process for handling FOIA requests and ICE's receipt of the FOIA request underlying this action. Upon receipt of Plaintiff's FOIA request, ICE determined that the Office of Enforcement and Removal Operations (ERO) was the only program office that was reasonably likely to have responsive documents because ERO is charged with overseeing and conducting operations regarding identification and apprehension of removable individuals, detention of these individuals, and removal of those here illegally.  (*Id*. at ¶¶ 17-18.)  ERO is composed of 7 headquarter divisions, 24 field offices, and more than 7,600 employees.  (*Id*. at ¶ 18.)  ERO processes FOIA requests through the ERO Information Disclosure Unit which assigns a point of contact to review the substance of the request and forward it to the specific individuals and component offices who might have responsive records.  (*Id*. at ¶ 19.)

Here, the point of contact "based on his knowledge of the program offices' activities within ERO, determined that the search should be conducted at the Enforcement Division, the Executive Information Unit, and the San Francisco Field Office."  (*Id.* at ¶ 21.)  The Enforcement Division is comprised of three divisions: the Criminal Alien Division, the Fugitive Operations and Training Division, and the Targeting Operations Division.  (*Id*. at ¶ 22.)  Plaintiff's FOIA request was sent to the Fugitive Operations and Training Division.  (*Id*. at ¶ 23.)  There, the Unit Chief for the ERO Academy searched the shared drive on his computer for manuals and lesson plans used in the Field Operations Training Program- Prosecution Module.  (*Id*. at ¶ 23.)  The Section Chief for the Field Operations Training Program- Prosecution Module conducted the same search and searched the ICE Training Management Support System database for the names of the officers involved in the apprehension of Plaintiff on March 2, 2015.  (*Id*.)  Responsive documents were forwarded back through the chain and the ICE FOIA office produced 107 pages of responsive documents with redactions on August 28, 2018.  (*Id*.)   A detention and deportation officer within this same division of ERO also performed a search of his email account for the terms "Anguiano" and "Cervantes," but no responsive documents were located.  (*Id*.) No other officers were tasked with a search for responsive documents.  (*Id*.)

The search of ERO's Executive Information Unit focused on the Policy Division subdivision, where a detention and deportation officer determined that the location most likely to contain responsive records was the ERO Policy Library. (*Id*. at ¶ 25.) The officer searched the ERO Policy Library using such terms as "training," "arrest, search and seizure," and "field operations." (Id.) An unspecified number of potentially responsive records were forwarded back to the ICE FOIA Office for review, 73 of these were ultimately produced with redactions on June 25, 2018. (*Id*. at ¶ 29.)

Finally, the FOIA point of contact for the San Francisco Field Office reviewed the FOIA request and "[b]ased on her experience and knowledge of ERO's practices and activities, she tasked one Supervisory Detention and Deportation Officer, as well as four Deportation Officers with conducting searches." (*Id*. at ¶ 26.) "[N]o other officers were tasked because, based on the subject matter of the FOIA request, no other officers were likely to have responsive records or would reasonably be expected to have responsive records."[4] (*Id*.) The Supervisory Detention and Deportation Officer searched his paper files, his computer, and his Microsoft Outlook account using search terms "such as 'Operations Plan,' 'Anguiano-Cervantes, Ariel,' and '206 357 263'" as well as ERO's Enforcement Alien Removal Module using Plaintiff's A-number. (*Id*.) The Deportation Officers searched their computers and Outlook accounts, again using search terms "such as the following: 'Cervantes,' 'Anguiano,' 'Ariel,' '206 357 263,' and 'Cross Check VI'" as well as the Enforcement Alien Removal Module using Plaintiff's A-number. (*Id*. at ¶ 27.) Two of the Deportation Officers also searched their paper files for responsive records and one searched two other Department of Homeland Security databases using the Plaintiff's A-number. (*Id*.) An unspecified number of responsive documents were forwarded to the ICE FOIA Office for review. (*Id*.) Seven pages of documents were ultimately produced with redactions on May 15, 2018. (*Id*. at ¶ 28.)

In response to issues raised by Plaintiff, ICE conducted further searches related to Request

---

[4] One of the individuals who had participated in Plaintiff's apprehension had left the San Francisco Field Office and moved to Homeland Security Investigations. That individual was tasked with conducting a search and searched his computer and email, but did not find any responsive records. (*Id*. at ¶ 27.)

7 (documents revealing the weapons and uniforms issued to the individuals who participated in Plaintiff's apprehension); Request 8 (documents regarding the work performance of each individual involved in Plaintiff's apprehension and detention); and Request 10 (records related to the formal or informal training which was received or should have been received by the ICE agents involved in Plaintiff's apprehension regarding the rights of persons stopped, questioned, or apprehended by ICE). (*Id.* at ¶¶ 31-34.) An additional 5 pages were produced as responsive to Request 7, 237 pages were produced as responsive to Request 8, and 107 pages were produced in response to Request 10. ICE declined to conduct any additional searches in response to Request 12 (ICE communications with the San Francisco Police Department related to Plaintiff's apprehension and/or related to ICE officers identifying themselves as police officers) because it determined that prior searches would have captured any such documents. (*Id.* at ¶ 35.)

Ultimately, ICE produced 517 pages which includes 154 documents in full, 319 documents with redactions, and 2 pages which were fully withheld. Plaintiff raises three challenges to the adequacy of ICE's search: (1) that ICE unreasonably narrowed the scope of its search; (2) that ICE applied overly restrictive search terms to its searches; and (3) that ICE failed to conduct any search for documents responsive to Request 12.

**1. Scope of the Search**

Plaintiff raises two objections to the scope of ICE's search. First, that ICE unreasonably narrowed the scope of departments within which it conducted its search. In particular, Plaintiff objects to ICE limiting the search to ERO because other divisions such as the Office of Leadership and Career Development within ICE's Management and Administration Office would likely have training materials responsive to Request 10. The Supplemental Pavlik-Keenan declaration explains that the Management and Administration Office was not searched for responsive records because it does not handle enforcement and removal apprehensions. (Dkt. No. 26-1 at ¶ 10.) Instead, the records of the National Fugitive Operations and Training Division, specifically, the ERO Academy and the Field Operations Training Program, were searched and provided 107 pages of responsive records. (*Id.* at ¶ 11.) Plaintiff takes issue with Pavlik-Keenan's statement that ICE only searched documents within the ERO program office because every item in Plaintiff's FOIA

request "concerns his apprehension by ERO." (Dkt. No. 26-1 at ¶ 10.) Plaintiff points out that he also seeks documents only indirectly connected to his apprehension; namely, policy materials, communications with SFPD regarding ICE officers identifying themselves as police, documents reflecting weapons and uniforms issued to officers who conducted the arrest, and documents relating to training officers received or should have received. (Dkt. No. 23-2 at 28-29 (Requests 9-11).)

Pavlik-Keenan's supplemental declaration clarifies why ERO was searched instead of the other directorates—Homeland Security, Management and Administration, and the Office of Professional Responsibility: it is the only one that handles enforcement and removal apprehensions. (Dkt. No. 26-1 at ¶ 10.) Thus, to the extent that ICE was searching for documents regarding training for enforcement and removal apprehensions—which is what Request 10 calls for—ERO would be the directorate with that information. The Court is thus unpersuaded that ICE improperly limited the scope of departments searched.

Second, Plaintiff insists that the scope of the search within ERO was too narrow and should have included other subdivisions beyond the Fugitive Operations and Training Division; namely, the Criminal Alien Division or the Targeting Operations Division. In response, ICE elaborated regarding the search in Pavlik-Keenan's supplemental declaration explaining that the Criminal Alien Division was not searched because it concerns the arrests of aliens who are in custody and Plaintiff was not in custody when he was apprehended. (*Id*. at ¶ 13.) Likewise, while ICE did not believe the Targeting Division would have responsive documents, in response to Plaintiff's concern, the Chief of Staff of the Targeting Division tasked three components of the Division to conduct searches for responsive documents including a Deportation Officer in the Pacific Enforcement Response Center, a Detention and Deportation Officer in the National Criminal Analysis and Targeting Center, and a Deputy Director of the Law Enforcement Support Center. (*Id*. at ¶ 14.) These collective searches produced 2 additional pages of responsive records which were produced with redactions on October 5, 2018. Plaintiff challenges that these three individuals only searched their emails and two databases, and there is no explanation as why these were the only two databases searched.

"Speculative claims about the existence of additional documents are insufficient to rebut the presumption of good faith," *Span v. DOJ*, 696 F.Supp.2d 113, 119 (D.D.C. 2010) (citations omitted); however, the agency cannot ignore "*clear leads* ... [that] may indicate ... other offices that should have been searched." *Rollins v. U.S. Dep't of State*, 70 F.Supp.3d 546, 550 (D.D.C. 2014) (emphasis added). Here, while Plaintiff takes issue with the scope of the Targeting Division search, Plaintiff has not suggested that there are places that should have been searched but were not searched. "When a request does not specify the locations in which an agency should search, the agency has discretion to confine its inquiry to a central filing system if additional searches are unlikely to produce any marginal return; in other words, the agency generally need not search every record system." *Campbell v. U.S. Dep't of Justice*, 164 F.3d 20, 28 (D.C. Cir. 1998), as amended (Mar. 3, 1999) (internal quotation marks and citation omitted); *see also Hamdan*, 797 F.3d at 772 (rejecting plaintiffs argument that the FBI's database search was inadequate where "Plaintiffs have made no showing that by the close of the FBI's search, leads had emerged suggesting a need to search other databases"). Plaintiff has not identified any evidence that supports an inference that ICE ignored clear leads regarding the possible existence of responsive records in other databases, and as such, the search is entitled the presumption of good faith. *See id.* ("plaintiffs were entitled to a reasonable search for records, not a perfect one.").

Accordingly, there is no genuine dispute that the scope of ICE's search was adequate.

### 2. ICE's Use of Search Terms

Plaintiff raises two issues with ICE's search terms: (1) ICE's failure to identify all the search terms used, and (2) the adequacy of the search terms which are identified. In response to Plaintiff's argument that the Pavlik-Keenan Declaration only provided examples of search terms rather than a list of all the search terms used, the supplemental Pavlik-Keenan Declaration clarifies the search terms used by the San Francisco Field Office employees whose records were searched. (Dkt. No. 26-1 at ¶ 8.) Plaintiff notes that the supplemental declaration contains no reference to the search terms used to search the ERO Policy Library. Indeed, the initial Pavlik-Keenan declaration stated that the officer used "such terms as 'training,' 'arrest, search, and seizure' and 'field operations.'" (Dkt. No. 23-1 at ¶ 25.) ICE should provide Plaintiff with a complete list of

the search terms used. *See People for the Am. Way Found. v. Nat'l Park Serv.*, 503 F. Supp. 2d 284, 293 (D.D.C. 2007) (collecting cases regarding the agency's obligation to provide the search terms used so that plaintiffs have sufficient information from which they can evaluate the adequacy of the search).

Second, Plaintiff insists that ICE has not explained why the search terms that it did use are adequate. In particular, Plaintiff contends that the five San Francisco Field Office officers used inconsistent search terms and failed to use terms that might identify responsive documents not directly pertaining to Plaintiff such as training materials. According to the Pavlik-Keenan Declaration, each of the officers exercised their discretion to choose their own search terms. (Dkt. No. 26-1 at ¶ 7.) Generally, "[w]here the search terms are reasonably calculated to lead to responsive documents, the Court should not 'micro manage' the agency's search." *Liberation Newspaper v. U.S. Dep't of State*, 80 F. Supp. 3d 137, 146 (D.D.C. 2015). However, the agency must provide sufficient information regarding how the search terms were selected. *See Nat'l Immigration Law Ctr. v. United States Immigration & Customs Enf't*, No. CV149632PSGMANX, 2015 WL 12684437, at *6 (C.D. Cal. Dec. 11, 2015) (rejecting plaintiff's argument that individual ICE field office searches were inadequate because the declarations "explain[ed] in some detail" why the individual offices used the search terms they did.) Here, ICE has not explained why the search terms used by the five officers were different; that is, ICE has not shown that their responsibilities with respect to Plaintiff's apprehension or apprehension actions generally was different such that the same search terms should not be used across all their searches.

Likewise, ICE has not addressed why the officers' search terms did not include any reference to "training" or "training materials" given that Request 10 seeks "all records related to the formal or informal training which was received or should have been received by the ICE agents who apprehended Mr. Cervantes." (Dkt. No. 23-2 at 29.) This request for training materials is specific to these officers and thus would not have been captured by the searches ICE did for training materials generally within the ERO Policy Library.

Accordingly, the Court concludes that ICE has failed to satisfy its burden to demonstrate the reasonableness of its search with respect to the search terms used.

### 3. Request 12

Finally, Plaintiff contends that ICE's search for records responsive to Request 12, which sought "[a]ny and all records or information regarding ICE communications with the San Francisco Police Department related to Mr. Cervantes's apprehension and/or related to ICE officers identifying themselves as police or police officers," was inadequate. (Dkt. No. 23-2 at 28.)

First, Plaintiff argues that ICE ignores the portion of the request that relates to ICE officers identifying themselves as police or police officers. The Supplemental Pavlik-Keenan declaration attests that "ICE reasonably interpreted Item #12 as a request for communications between ICE and SFPD regarding the Plaintiff given the phrasing of the request and the fact that Plaintiff's FOIA request as a whole was seeking documents pertaining to or related to his apprehension." (Dkt. No. 26-1 at ¶ 15.) ICE's response ignores both the plain language of Request 12 and that Plaintiff's FOIA request seeks several categories of documents regarding ICE's policies, practices, and training generally. (Dkt. No. 23-2 at 28-29.)

ICE's alternative argument that if the request were not so limited, it is "so overbroad and vague that ICE could not have constructed or conducted a reasonable search for responsive records given the breadth of the terms involved" is unpersuasive. (Dkt. No. 26 at 15:25-28.) Plaintiff is seeking records regarding ICE communications with the San Francisco Police Department related to ICE officers identifying themselves as police or police officers. Plaintiff's request is reasonably described such that ICE can determine without guesswork what documents would be responsive—that is, any communications between ICE and the San Francisco Police Department which relate to ICE officers identifying themselves as police officers. *See Yagman v. Pompeo*, 868 F.3d 1075, 1081 (9th Cir. 2017).

Second, Plaintiff objects to ICE limiting its search to only the records of the six individuals involved in apprehending Plaintiff and seeks clarification as to whether these individuals would have been the only individuals responsible for liaising with the San Francisco Police Department. According to ICE, the officers were selected based on the San Francisco Field Office's FOIA point of contact's "experience and knowledge of ERO's practices and activities." (Dkt. No. 23-1

at ¶ 26.)  There is, however, no explanation for why or how these custodians were selected, and as such, ICE has failed to provide sufficient details about the search it conducted to show that it was reasonably likely to uncover responsive documents held by the San Francisco Field Office.

The Court thus finds that ICE has failed to demonstrate that it conducted a reasonable search for documents responsive to Request 12.

\*\*\*

In sum, while the Court concludes that the record is undisputed that the scope of ICE's search generally was adequate, it has not provided sufficient information regarding the search terms it used or its efforts to respond to Request 12 as discussed above.  Accordingly, within 30 days ICE is ordered to provide a supplemental declaration either detailing renewed search efforts or further explaining the adequacy of its search.  *See People for the Ethical Treatment of Animals, Inc. v. Bureau of Indian Affairs*, 800 F. Supp. 2d 173, 178 (D.D.C. 2011) ("in a FOIA case, even if defendant had failed in obtaining summary judgment because of an inadequate search, it does not necessarily follow that plaintiff prevails. Rather, the usual remedy is for the Court to remand to the agency to expand its search or to provide more detailed declarations regarding the scope of the search").  As stated at the hearing, the parties shall meet and confer prior to any additional searches to discuss, in particular, search term parameters with respect to Request 12.

## B.  FOIA Exemptions

The FOIA calls for "broad disclosure of Government records."  *CIA v. Sims*, 471 U.S. 159, 166 (1985).  To ensure broad disclosure, the FOIA "gives individuals a judicially-enforceable right of access to government agency documents."  *Lion Raisins v. Dep't of Agric.*, 354 F.3d 1072, 1079 (9th Cir. 2004); 5 U.S.C. § 552.  The FOIA specifically provides, in relevant part, that: "each agency, upon any request for records which (i) reasonably describes such records and (ii) is made in accordance with published rules stating the time, place, fees (if any), and procedures to be followed, shall make the records promptly available to any person."  5 U.S.C. § 552(a)(3)(A). There is a strong presumption in favor of disclosure.  *See U.S. Dep't of State v. Ray*, 502 U.S. 164, 173 (1991).  This "general philosophy of full agency disclosure [applies] unless information is exempted under clearly delineated statutory language."  *John Doe Agency v. John Doe Corp.*, 493

1    U.S. 146, 151-52 (1989) (quotation marks and citation omitted).  These exemptions "must be

2    narrowly construed."  *John Doe Agency*, 493 U.S. at 154.

3        The government agency bears the burden to prove a particular document or redaction falls

4    within one of the nine statutory exemptions from disclosure.  *Ray*, 502 U.S. at 173; *Lahr v. NTSB*,

5    569 F.3d 964, 973 (9th Cir. 2009).  The government may rely on affidavits to satisfy its burden of

6    demonstrating that an exemption applies, but the affidavits must contain "reasonably detailed

7    descriptions of the documents and allege facts sufficient to establish an exemption."  *Kamman v.*

8    *IRS*, 56 F.3d 46, 48 (9th Cir. 1995) (quoting *Lewis v. IRS*, 823 F.2d 375, 378 (9th Cir. 1987)); *see*

9    *also Shannahan v. IRS*, 672 F.3d 1142, 1148 (9th Cir. 2012) ("To justify withholding, the

10   government must provide tailored reasons in response to a FOIA request.  It may not respond with

11   boilerplate or conclusory statements."); *Church of Scientology v. Dep't of the Army*, 611 F.2d 738,

12   742 (9th Cir. 1980) (noting that the government "may not rely on conclusory and generalized

13   allegations of exemptions").  "[S]ummary judgment on the basis of such agency affidavits is

14   warranted if the affidavits describe the documents and the justifications for nondisclosure with

15   reasonably specific detail, demonstrate that the information withheld logically falls within the

16   claimed exemption, and are not controverted by either contrary evidence in the record nor by

17   evidence of agency bad faith."  *Military Audit Project v. Casey*, 656 F.2d 724, 738 (D.C. Cir.

18   1981).

19       Even if an exemption applies, an agency may only withhold the information to which the

20   exemption applies.  *Yonemoto v. Dep't of Veterans Affairs*, 686 F.3d 681, 688 (9th Cir. 2012).

21   The agency is therefore required to provide all "reasonably segregable" portions of the records to

22   the requester.  5 U.S.C. § 552(b).  "The burden is on the agency to establish that all reasonably

23   segregable portions of a document have been segregated and disclosed."  *Pac. Fisheries, Inc. v.*

24   *United States*, 539 F.3d 1143, 148 (9th Cir. 2008).  "To meet its burden in this regard, the agency

25   must provide[ ] a detailed justification and not just conclusory statements."  *ACLU of N. Cal. v.*

26   *FBI*, No. C 12-03728 SI, 2014 WL 4629110, at *3 (N.D. Cal. Sept. 16, 2014) (internal quotation

27   marks and citation omitted).

28       In response to Plaintiffs' FOIA request, ICE has asserted three categories of statutory

                                                    13

exemptions: (1) Exemption 5 which generally protects non-discoverable information such as information protected by attorney-client or work-product privileges, *see* 5 U.S.C. § 552(b)(5); (2) Exemption 7(E) which protects records compiled for law enforcement purposes which would disclose techniques and procedures not generally known, *see id*. at § 552(b)(7)(E); and (3) Exemptions 6, and 7(C) which protects disclosure of information that would constitute an unwarranted invasion of personal privacy, *see id*. at §§ 552(b)(6), 552(b)(7)(C). The Court addresses each exemption separately.

### 1. Exemption 5

Exemption 5 shields disclosure of "interagency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). Information withheld under Exemption 5 must "satisfy two conditions: its source must be a Government agency, and it must fall within the ambit of a privilege against discovery under judicial standards that would govern litigation against the agency that holds it." *Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8 (2001). Specifically, Exemption 5 covers the attorney-client privilege, the work-product privilege, and the deliberative process privilege. *Maricopa Audubon Soc. v. U.S. Forest Serv*., 108 F.3d 1089, 1092 (9th Cir. 1997). Exemption 5 is to be "applied as narrowly as consistent with efficient Government operation." *Lahr*, 569 F.3d at 979.

ICE has invoked Exemption 5 over portions of Fourth Amendment Policy and Refresher Training Materials.[5] ICE contends that the materials are protected by attorney-client and attorney work-product privilege because they reflect the opinions, analysis, guidance and legal advice provided by attorneys in the ICE Office of the Principal legal Advisor (OPLA). (Dkt. No. 23-1 at 19.) ICE maintains that the redacted information "constitute and/or reflect advice from ERO attorneys who specialized in [Fourth Amendment] law to their clients about recommended practices and strategies regarding specific law enforcement tactics, techniques, and procedures in certain filed operations" and that the documents were prepared in contemplation of litigation both

---

[5] ICE has also asserted Exemption 7(E) over this same redacted information. (Dkt. No. 23-2 at 17-20.)

United States District Court
Northern District of California

in immigration and in federal court." (*Id*. at 19-20.)

The Court cannot make a determination regarding whether these redactions reflect privileged information without reviewing them *in camera*. *See Lion Raisins v. U.S. Dep't of Agric.*, 354 F.3d 1072, 1079 (9th Cir. 2004), *overruled by Animal Legal Def. Fund v. U.S. Food & Drug Admin.*, 836 F.3d 987 (9th Cir. 2016) ("District courts have discretion to order *in camera* inspection of the actual documents the government wishes to withhold"). Accordingly, ICE shall provide the Court with an unredacted version of the training materials for *in camera* review.

### 2. Exemption 7(C) and 6

Both Exemption 6 and Exemption 7(C) exempt the release of records which would constitute an "unwarranted invasion of personal privacy." 5 U.S.C. §§ 552(b)(6), (b)(7)(C). Exemption 6 covers "personnel and medical files and similar files," and only allows withholding files the disclosure of which "would constitute a clearly unwarranted invasion of personal privacy." Exemption 7(C) covers "records or information compiled for law enforcement purposes," and allows withholding files which "could reasonably be expected to constitute an unwarranted invasion of personal privacy." In this case, ICE has asserted Exemption 6 every time it has asserted Exemption 7(C) "to protect from disclosure the names, signatures, biometric information, contact information, phone numbers, postal addresses, email addresses, photographs, dates of birth, state and federal identification numbers, immigration history, and/or other identifying information of third parties."[6] (Dkt. No. 23-1 at ¶ 50; *see also* Dkt. No 23-2 (Vaughn Index); Dkt. No. 26-2 (Supp. Vaughn Index).)

When evaluating whether a government agency can properly invoke Exemptions 6 and/or 7(C), courts employ a three-step test for balancing the privacy rights of the individuals against the public interest in disclosure. *See Tuffly v. U.S. Dep't of Homeland Sec.*, 870 F.3d 1086, 1093 (9th

---

[6] "The only distinction between the balancing tests applied in the two exemptions is the magnitude of the public interest required to override the respective privacy interests they protect." *Tuffly v. U.S. Dep't of Homeland Sec.*, 870 F.3d 1086, 1092 (9th Cir. 2017) (internal citation and quotation marks omitted). "The standard for Exemption 6 is higher in that it requires the disclosure of the files to constitute a "clearly unwarranted" invasion of privacy, whereas Exemption 7(C) only requires that the disclosure "could reasonably be expected to constitute" such an invasion." *Am. Civil Liberties Union of N. California v. Fed. Bureau of Investigation*, No. 12-CV-03728-SI, 2015 WL 678231, at *5 (N.D. Cal. Feb. 17, 2015), appeal dismissed (Jan. 5, 2016).

Cir. 2017). First, the Court evaluates the personal privacy interest to determine whether the "disclosure implicates a personal privacy interest that is nontrivial or ... more than [ ] de minimis." *Yonemoto v. Dep't of Veterans Affairs*, 686 F.3d 681, 693 (9th Cir. 2012), overruled on other grounds by *Animal Legal Def. Fund v. U.S. Food & Drug Admin.*, 836 F.3d 987 (9th Cir. 2016). Second, if there is a privacy interest at stake, the requester "must show that the public interest sought to be advanced is a significant one ... and that the information is likely to advance that interest." *Nat'l Archives & Records Admin. v. Favish*, 541 U.S. 157, 172 (2004). "Absent a showing of a significant public interest under step two, the invasion of privacy is unwarranted, and the information is properly withheld." *Tuffly*, 870 F.3d at 1093. However, if both a nontrivial privacy interest and a significant public interest are present, the court must balance the two interests. *Id.*

Here, ICE asserts privacy interests for two categories of individuals: (1) ICE employees, and (2) third parties identified in ICE records. Plaintiff appears to only challenge the redactions with respect to the first category—the ICE employees. Plaintiff seeks these individuals' names, training records, and performance evaluations (although Plaintiff agrees that identifying information can be redacted from the latter category). ICE insists that disclosure of this information could subject the ICE employees to harassment and danger, and interfere with their ability to effectively conduct future investigations.

Law enforcement officers "have a legitimate interest in keeping private matters that could conceivably subject them to annoyance or harassment." *Hunt v. FBI*, 972 F.2d 286, 288 (1992). In particular, officers "retain an interest in keeping private their involvement in investigations of especially controversial events." *Lahr v. NTSB*, 569 F.3d 964, 977 (9th Cir. 2009); *see also Neely v. F.B.I.*, 208 F.3d 461, 464–65 (4th Cir. 2000) ("FBI agents, government employees, third-party suspects, and other third parties mentioned or interviewed in the course of the investigation have well-recognized and substantial privacy interests in the withheld information. Among other things, these individuals have a substantial interest in the nondisclosure of their identities and their connection with particular investigations because of the potential for future harassment, annoyance, or embarrassment."); *see also Cameranesi v. U.S. Dep't of Def.*, 856 F.3d 626, 638

(9th Cir. 2017) ("Disclosures that would subject individuals to possible embarrassment, harassment, or the risk of mistreatment constitute nontrivial intrusions into privacy."). Given the extensive media attention on ICE in this politically charged climate, the ICE employees here have a nontrivial privacy interest. *See Am. Civil Liberties Union of N. California v. Fed. Bureau of Investigation*, No. C 12-03728 SI, 2014 WL 4629110, at *8 (N.D. Cal. Sept. 16, 2014) (holding that "the FBI has sufficiently shown that these local law enforcement officers have a legitimate interest in keeping their individual names private" given "the extensive media attention both the Occupy movement and local law enforcement's response to the movement has received.").

The Court thus turns to Plaintiff's asserted public interest in the disclosure: to shed light on the specific incident at issue here—Mr. Cervantes's arrest—and to provide an understanding of how law enforcement policy is carried out. According to Plaintiff, "[t]here is a public interest in fully understanding how ICE implements its policies relating to search and seizure and apprehension of suspects" which "would be served by knowing the identities of ICE officers in documents that directly or indirectly bear on their actions in apprehending Mr. Cervantes: documents describing the apprehension itself, as well as documents reflecting training they may have received regarding how to conduct such operations and documents reflecting firearms and other materials issued to them that they may have used." (Dkt. No. 25 at 27:5-11.)

Plaintiff insists that this is akin to the public interest at stake in *Citizens for Responsibility & Ethics in Washington v. U.S. Dep't of Justice*, 746 F.3d 1082 (D.C. Cir. 2014), where the documents sought concerned the FBI's wide-ranging investigation of public corruption related to former lobbyist Jack Abramoff and Congressman Tom DeLay. But the privacy interest there was DeLay's; he had already publicly identified himself as a target of the investigation, so his interest was not in keeping secret that he was a subject of the investigation, but rather, the contents of the investigation. *Id*. at 1091. The court's reference to a "public interest in the manner in which the DOJ carries out substantive law enforcement policy" was in the context of disclosure of documents which related to "a wide-ranging public corruption investigation as part of [the FBI's] ongoing efforts to root out systemic corruption within the highest levels of government." *Id*. at 1093. The court found that disclosure "of the FD–302s and investigative materials could shed

light on how the FBI and the DOJ handle the investigation and prosecution of crimes that undermine the very foundation of our government." *Id*.

Plaintiff has made no similar showing here. Indeed, Plaintiff does not suggest that there was misconduct on the part ICE, but rather, that the public has an interest in understanding how law enforcement policy is carried out. This asserted public interest is insufficient to outweigh the ICE employee's legitimate interest in keeping their names private. *See Am. Civil Liberties Union of N. California v. Fed. Bureau of Investigation*, No. C 12-03728 SI, 2014 WL 4629110, at *8 (N.D. Cal. Sept. 16, 2014) (holding that the privacy interest of FBI agents in their names and identifying information outweighed the plaintiffs' asserted privacy interest in "shed[ding] light on the FBI's conduct."); *see also Gordon v. F.B.I.*, 388 F. Supp. 2d 1028, 1044–45 (N.D. Cal. 2005) (holding that "[c]ommon sense dictates that revealing the names of officials intimately involved with the distribution, implementation and maintenance of watch lists could reasonably be expected to make these officials targets of those who want access to the lists or non-public information about the lists[and] [t]his privacy interest outweighs the minimal public interest in learning the names of these officials, especially since plaintiffs have not identified any public interest in learning whether an[y] specific person is or is not involved with the lists.").

Accordingly, the Court concludes that ICE has met its burden of establishing that the names and other identifying information of ICE employees was properly withheld in accordance with Exemptions 6 and 7(C).

### 3. Exemption 7(E)

Exemption 7(E) protects records from disclosure if those records "would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law." 5 U.S.C. § 552(b)(7)(E). "The statutory requirement that the government show that disclosure 'could reasonably be expected to risk circumvention of the law' applies only to guidelines for law enforcement investigations or prosecutions, not to techniques and procedures." *American Civil Liberties Union of Northern California v. United States Department of Justice*, 880 F.3d 473, 491(9th Cir. 2018) (quoting

18

*Hamdan v. U.S. Dep't of Justice*, 797 F.3d 759, 778 (9th Cir. 2015)). Investigative techniques are only exempt if they "are not generally known to the public." *Rosenfeld v. U.S. Dep't of Justice*, 57 F.3d 803, 815 (9th Cir. 1995). "As used in Exemption 7(E), 'guidelines' refer to how the agency prioritizes its investigative resources, while 'techniques and procedures' cover 'how law enforcement officials go about investigating a crime.'" *Am. Civil Liberties Union of San Diego & Imperial Ctys. v. United States Dep't of Homeland Sec.*, No. 15-0229, 2017 WL 9500949, at *12 (C.D. Cal. Nov. 6, 2017) (quoting *Allard K. Lowenstein Int'l Human Rights Project v. Dep't of Homeland Sec.*, 626 F.3d 678, 682 (2d Cir. 2010)).

While "Exemption 7(E) sets a relatively low bar for the agency to justify withholding" the agency still must "demonstrate logically how the release of the requested information might create a risk of circumvention of the law." *Blackwell v. F.B.I.*, 646 F.3d 37, 42 (D.C. Cir. 2011); *see also American Immigration Council v. United States Department of Homeland Security*, 30 F.Supp.3d 67, 76 (D.D.C. 2014) (holding that the agency "must nevertheless provide a relatively detailed justification for each record that permits the reviewing court to make a meaningful assessment of the redactions.").

Here, ICE has invoked Exemption 7(E) to protect information contained in the following three documents (1) the Fugitive Operations Handbook; (2) a Department of Justice Handbook on "The Law of Arrest, Search and Seizure for Immigration Officers," and (3) ERO "Training Material and Policy Refresher on the Fourth Amendment." (Dkt. No. 23-1 at ¶ 57.) ICE has also invoked the exemption with respect to other information "such as law enforcement databases and codes, identification numbers, serial numbers, operation names, background checks, and FBI numbers." (ID. at ¶ 58.) The Court addresses each category separately.

### a) The Fugitive Operations Handbook

ICE has invoked the exemption with respect to several portions of this document and two pages in their entirety. The partially redacted information contains "law enforcement sensitive techniques, procedures, and guidelines that are not well-known, particularly with respect to lead development; operational plans for the Fugitive Operations Program Teams; and case management, processing, and reporting (including, for example, with respect to supervision

violations, escapes, international fugitives, or fugitives who pose a threat to national security)."

(Dkt. No. 23-2 at 9-10.) The two pages of total redactions "contain a sample operational plan and a

sample report, both reflecting a law enforcement technique and procedure that is not well known"

as well as "information about law enforcement databases." (*Id*. at 11.)

Plaintiff argues that the information ICE has provided is not sufficiently detailed. In

particular, Plaintiff objects to ICE's failure to distinguish between law enforcement techniques and

procedures and law enforcement guidelines when invoking Exemption 7(E). However, the

Supplemental Pavlik-Keenan Declaration provides greater specificity regarding the redactions.

(Dkt. No. 26-1.) In particular, Pavlik-Keenan attests that redacted guidelines and techniques are

not well known to the public and risk circumvention of the law because they discuss "guidelines,

techniques, and procedures regarding supervision violations, escapes, international fugitives, or

fugitives who pose a threat to national security," which, if disclosed, "would provide those

attempting to circumvent the law with a step-by-step guide on how to avoid law enforcements

efforts." (*Id*. at ¶¶ 20-21.) Also, the redacted information contains "law enforcement codes and

numbers, serial numbers, and other database information [that] could reasonably be expected to

present malfeasors the opportunity to breach sensitive law enforcement systems." (*Id*. at ¶ 22.)

Generally, "records that provide a detailed, technical analysis of the techniques and

procedures used to conduct law enforcement investigations may properly be withheld under

Exemption 7(E)." *ACLU*, 880 F.3d at 491 (internal citation and quotation marks omitted). In

*Hamdan*, the Ninth Circuit held that the FBI properly withheld agency records that described

specific means of carrying out surveillance and conducting credit searches even though those

general techniques were known to the public because while the public might be aware that law

enforcement used these particular techniques, the public would not be aware of the "specific

*means*" for conducting the surveillance or searches reflected in the documents. *Hamdan*, 797 F.3d

at 777–78 (emphasis in original). Here, while ICE often uses "guideline" and "technique"

simultaneously to describe the reason for its redactions in the Fugitive Operations Handbook, it is

semantics rather than substance. Based on the Court's review of the unredacted portions of the

document and the representations in the Supplemental Pavlik-Keenan Declaration regarding the

material that is redacted, the redacted material is "detailed, technical analysis of the techniques and procedures used to conduct law enforcement investigations," which given the purpose of the document—providing guidance for apprehending individuals who have evaded law enforcement—creates an inherent risk that disclosure of these techniques risks circumvention of the law should the information become publicly known.

Although Plaintiff argues that ICE has failed to demonstrate that the redacted information is not publicly known, Plaintiff has offered no reason to believe that the precise techniques that law enforcement officers undertake to apprehend fugitives are publicly known. The article that Plaintiff cites discusses instances in which ICE officers identified themselves as police officers. (Dkt. No. 25 at 25:23-26:1 (citing Joel Rubin, *It's Legal for an Immigration Agent to Pretend to Be a Police Officer Outside Someone's Door. But Should it Be?*, L.A. TIMES (February 21, 2017) http://www.latimes.com/local/lanow/la-me-immigration-deportation-ruses-20170219-story.html. While there is a section in the Fugitive Handbook entitled "Law Enforcement Identification" which may reference this technique, it is also may contain specific information regarding how this tactic is used. Indeed, the Supplemental Pavlik-Keenan Declaration notes that even if the public knows that ICE uses a particular technique, the step-by-step guide to how it is used is not widely known. (Dkt. No. 26-1 at ¶ 21.) Even where a particular law enforcement technique is publicly known, if the "affidavits say that the records reveal techniques that, if known, could enable criminals to educate themselves about law enforcement methods used to locate and apprehend persons" the court can infer that this is because the specific *means* by which law enforcement uses the techniques are not publicly known. *Hamdan*, 797 F.3d at 777–78. Here, as in *Hamdan*, while the public may generally know that ICE uses particular techniques, the step-by-step means for applying these techniques is not publicly known.

On this record, the Court concludes that ICE has met its burden for invoking Exemption 7(E) over the fugitive Operations Handbook.

**b) Department of Justice Handbook on "The Law of Arrest, Search and Seizure for Immigration Officers"**

ICE has also invoked the exemption as to a chapter heading and the contents of this same

21

1   chapter in the "The Law of Arrest, Search and Seizure for Immigration Officers" handbook.  (Dkt.

2   No. 25-4 at 44, 62.)  ICE maintains that the chapter title would "reveal a law enforcement

3   technique that is not commonly known" and that the chapter contents consist of three paragraphs

4   "describing and providing guidelines for the law enforcement technique that is not commonly

5   known." (Dkt. No. 23-2 at 12.)  The Supplemental Pavlik-Keenan Declaration attests that

6   "[d]isclosure of this information could reasonably be expected to jeopardize ongoing ICE

7   investigations and operations and assist those seeking to violated or circumvent the law by

8   assisting fugitive aliens in identifying undercover initiatives and evading apprehension."  (Dkt.

9   No. 26-1 at ¶ 25.)  However, without even the name of the technique or any context for why this

10  technique out of all the techniques referenced in the handbook is not commonly known, the Court

11  lacks sufficient information to consider whether ICE properly redacted this information under

12  Exemption 7(E).  Accordingly, ICE shall produce the redacted information for *in camera* review.

### c) ERO Training Material and Policy Refresher on the Fourth Amendment

14  Given the Court's finding that it must review the Fourth Amendment training materials *in

15  camera* to determine if ICE properly invoked Exemption 5, the Court will also review the

16  materials *in camera* to determine whether Exemption 7(E) applies.

### d) Other documents

18  ICE has also invoked Exemption 7(E) with respect to portions of other documents to

19  protect from disclosure other sensitive information "such as law enforcement databases and codes,

20  identification numbers, serial numbers, operation names, background checks, and FBI numbers."

21  (Dkt. No. 23-1 at ¶ 58.)  According to ICE, information regarding how law enforcement officers

22  access databases, evaluate cases and perform background checks is a law enforcement technique

23  and procedure that is not commonly known. In addition, according to the Supplemental Pavlik-

24  Keenan Declaration this information is "used for the purpose of indexing, storing, locating, and

25  retrieving law enforcement sensitive information, is not commonly known, and could be used to

26  decipher the meaning of codes, navigate within law enforcement systems, and compromise the

27  integrity of the data either by allowing for the deletion or alteration of information." (Dkt. No. 26-

28  1 at ¶ 22.)

Based on this showing, ICE has met its burden of invoking Exemption 7(E) with respect to serial numbers, law enforcement codes, law enforcement database checks, operation names, background checks, state identification numbers, and FBI numbers. *See Rojas-Vega v. United States Immigration & Customs Enf't*, 302 F. Supp. 3d 300, 310 (D.D.C. 2018) (holding that ICE properly invoked 7(E) for "internal URLs, case numbers, case categories, subject identification numbers, case identification numbers, and internal identifying codes and departure statuses."); *Parker v. U.S. Immigration & Customs Enf't*, 238 F. Supp. 3d 89, 100 (D.D.C. 2017) (holding that disclosure of "sensitive database and event codes, identification numbers, law enforcement system URLs, internal website links, record identification numbers, event numbers, category codes, TECS codes, method codes, file numbers, ... status codes, internal agency codes, case numbers, program codes, and system codes" "could reasonably be expected to create a risk of circumvention by revealing how ICE's databases work and rendering them more vulnerable to manipulation.").

## CONLCUSION

For the reasons stated above, the Court defers ruling on the parties' cross-motions for summary judgment pending ICE's submission of the following:

1) A supplemental declaration either detailing renewed search efforts or further explaining the adequacy of the search terms it used and its efforts to respond to Request 12 within 30 days; and

2) Unredacted versions of (1) the documents withheld under Exemption 5, and (2) the Department of Justice Handbook on "The Law of Arrest, Search and Seizure for Immigration Officers" and ERO Training Material and Policy Refresher on the Fourth Amendment withheld under Exemption 7(E), for *in camera* review within 21 days. The documents should be delivered directly to chambers and not filed on the docket.

**IT IS SO ORDERED.**

Dated: November 13, 2018

_Jacqueline Scott Corley_
JACQUELINE SCOTT CORLEY
United States Magistrate Judge